IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DONNA M. UNDERBERG, as Personal Representative of the Estate of Thomas J. Underberg and as Personal Representative on behalf of Donna M. and Mark G. Underberg,<br><br>Plaintiff,<br><br>vs.<br><br>EMPLOYERS MUTUAL CASUALTY COMPANY,<br><br>Defendant. | CV 15-112-BLG-TJC<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGEMENT REGARDING CHOICE OF LAW; AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING DUTY AND CAUSATION** |

Plaintiff Donna M. Underberg, as Personal Representative of the Estate of

Thomas J. Underberg, and as Personal Representative on behalf of Donna M. and

Mark G. Underberg ("Underberg"), brings this action against Employers Mutual

Casualty Company ("EMC") for spoliation of evidence. (Doc. 1.) Underberg

claims that EMC wrongfully disposed of a pickup truck that was relevant evidence

in a potential civil lawsuit. (*Id.*) Presently before the Court are EMC's Motion for

Partial Summary Judgment Regarding Choice of Law (Doc. 36), and EMC's

Motion for Summary Judgment regarding Duty and Causation. (Doc. 39.)

Having considered the parties' submissions, the Court finds EMC's Motion

for Partial Summary Judgment Regarding Choice of Law should be **DENIED**, and

EMC's Motion for Summary Judgment Regarding Causation and Duty should be **GRANTED**.

## I. FACTUAL BACKGROUND[1]

On November 6, 2012, Thomas J. Underberg ("TJ") was killed in an automobile collision near Trenton, North Dakota. (Doc. 46 at ¶¶ 1.) At the time of the accident, TJ was driving a 2010 Dodge Ram 3500 pickup truck ("the pickup"), owned by his employer Cross Petroleum Services ("Cross Petroleum"), a Montana corporation. (*Id.* at ¶ 2.) TJ was working for Cross Petroleum at the time. (*Id.* at ¶ 3.) After the collision, Chaney's Total Auto Exhaust & Towing took the truck to a Williston, North Dakota storage yard. (*Id.* at ¶ 5.)

EMC, an Iowa insurance company licensed to conduct business in Montana, insured the pickup for Cross Petroleum. (*Id.* at ¶ 4.) Neither TJ nor his Estate were named insureds under the EMC policy. (*Id.*) North Dakota-based EMC adjuster Kathy VanBrocklin ("VanBrocklin") adjusted the first and third party claims arising out of the collision. (*Id.* at ¶ 6.)

On November 8, 2012, VanBrocklin contacted Cross Petroleum to explain the claim procedure when there is a total loss, and noted that, according to the

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

photos, it did not appear that the pickup had any salvage value.  (*Id.* at ¶ 7.)  On November 12, 2012, VanBrocklin sent an email to Greg Cross of Cross Petroleum and indicated that she had "talked to Chaney's Towing and they will dispose [of] the truck."  (Doc. 38-1 at 9.)

On November 9, 2012, EMC received the North Dakota Highway Patrol Accident Report.  (Doc. 38-1 at 4.)  The report stated the pickup was traveling eastbound, negotiating a curve, when it crossed the centerline and side-swiped a semi-tractor that was travelling in the opposite direction.  (*Id.* at 7.)

EMC's claims notes indicate that on November 20, 2012, VanBrocklin spoke with Jason Kusmenko ("Kusmenko") who was the driver of the semi-tractor, and third-party claimant under the Policy.  (Doc. 38-1 at 56.)  VanBrocklin obtained Kusmenko's recorded statement.  Kusmenko described the accident, and his observations of TJ just prior to the accident.  (Id.)  Kusmenko stated he saw the pickup cross the centerline, and it appeared TJ was looking at his hands in front of him or something in his hands.  (*Id.*)  Just prior to impact, Kusmenko made eye contact with TJ.  (Id.)  Kusmenko moved as far to the right shoulder as he could to avoid the collision, but stated the pickup was almost all the way into his lane at impact.  (*Id.*)  VanBrocklin noted the marks left at the scene confirmed Kusmenko's account.  (*Id.*)  VanBrocklin told Kusmenko that she could not accept liability at that time because the investigation was ongoing.  (*Id.*)

3

On November 27, 2012, VanBrocklin talked to Donna Underberg. (Docs. 46 at ¶ 11; 38-1 at 55.) VanBrocklin explained the benefits which were available under the Policy that could cover what worker's compensation did not. (Doc. 38-1 at 55.) VanBrocklin gave Donna Underberg her phone number to call if she had any questions. (*Id.*) VanBrocklin did not discuss retention or disposal of the pickup with Donna or Mark Underberg. (Docs. 46 at ¶ 11; 47-2 at 17.) There is no indication Donna or Mark Underberg, or the Estate ever contacted EMC regarding the pickup. (Doc. 46 at ¶ 11.)

On November 30, 2012, EMC obtained a Carfax report for the pickup that indicated there were no outstanding manufacturer recalls or prior accidents. (Docs. 38-2 at ¶ 7; 38-8 at 2-6; 46 at ¶ 19.)

Also on November 30, 2012, Cross Petroleum decided to let EMC take possession of the pickup, and transferred salvage title to EMC in exchange for the pickup's actual cash value. (Docs. 46 at ¶ 8.) Cross Petroleum did not request that EMC hold or retain the pickup. (Doc. 46 at ¶ 8.) A claims note from the same date indicated "[s]alvage was disposed of by the adjuster." (Doc. 38-1 at 53.)

On December 3, 2012, EMC received a copy of the full investigative file from the North Dakota Highway Patrol. (Doc. 38-1 at 19-41.) VanBrocklin also spoke to North Dakota Highway Patrol Trooper Brett Mlyner regarding the circumstances of the collision. (*Id.* at 52.) It was determined that TJ crossed the

4

center line and impacted the semi-tractor on the sleeper and then down the side of the cab and trailer.  (*Id.*)  The pickup did not leave any marks on the pavement pre-crash, which indicated TJ did not take any evasive action.  (*Id.*)  It was noted that there was no solid evidence TJ was texting, and there was no indication of alcohol or drug use by TJ.  (*Id.*)  Trooper Mlynar's report stated Kusmenko was not sure if TJ had anything in his hand, but Kusmenko said TJ was looking at his left hand as if he was holding a cell phone.  (Doc. 38-1 at 16.)  Kusmenko also stated he made "eyeball to eyeball" contact with TJ, and he thought TJ would then steer to the right, but he never did.  (*Id.*)

On December 3, 2012, EMC also made a liability determination.  EMC's investigation concluded that while TJ was driving the pickup eastbound along a curve to the right, he crossed the center line and collided with the semi-tractor.  (Doc. 46 at ¶ 12.)  EMC found TJ was 100% at fault.  (*Id.*; Doc. 38-1 at 51.)  EMC contacted Kusmenko the same day and accepted liability.  (Doc. 38-1 at 50.)

Sixteen months later, on April 3, 2014, Greg Cross contacted VanBrocklin because he had received a letter from Underberg's attorney asking about the pickup.  (Doc. 38-1 at 45.)  He reported that TJ's parents had located a safety recall on the pickup for the steering mechanism.  (*Id.*)  Their attorney wanted to know where the salvage was sold.  (*Id.*)  VanBrocklin stated EMC had Chaney's dispose of the truck, and that it would have been crushed.  (*Id.*)

On June 16, 2015, Greg Cross spoke with VanBrocklin again because he had been contacted by Chrysler regarding the pickup. (Doc. 38-1 at 44.) Cross requested EMC provide a letter confirming the pickup had been disposed of. (Id.) VanBrocklin provided the letter the same day. (*Id.* at 43.)

Almost three years after the accident, on October 23, 2015, Underberg filed an amended complaint against FCA US, LLC, f/k/a/ Chrysler Group, LLC, Chrysler Group, LLC ("Chrysler") and Truck Supplies, Inc., in Montana state court (the "underlying litigation"). (Doc. 46 at ¶ 13.) Underberg brought a claim of strict products liability against Chrysler and negligence against Chrysler and Truck Supplies. (Doc. 38-3 at 2-8.) Underberg alleged that known design defects in the steering linkage systems of Dodge Rams trucks, including the pickup TJ was driving, left the outer tie rod susceptible to fracture and a loss of steering control. (*Id.* at 4.) Underberg asserted the defect caused TJ to lose directional control of the pickup and crash. (*Id.* at 5.) Underberg alleged Truck Supplies negligently performed service and inspection work on the pickup. (*Id.*)

The underlying litigation was dismissed with prejudice on October 7, 2016, following settlement between Underberg and the defendants. (*Id.* at ¶ 14.)

Plaintiff filed also this action against EMC on November 5, 2015, asserting a claim for spoliation of evidence. (Doc. 1.) Plaintiff admits that no one contacted EMC on behalf of the Estate regarding the pickup "at any time within one year of

the accident." (Doc. 46 at ¶ 11.)  It is also undisputed that Underberg did not give notice to EMC at any time to preserve or hold the pickup.  (*Id.* at ¶ 10.) Nevertheless, Underberg asserts that at the time EMC disposed of the pickup, EMC had notice of safety recalls regarding Dodge Ram trucks, and knew or should have known of the potential for a civil action.  (Doc. 1 at ¶¶ 18, 23.)

Underberg references two separate safety recalls relative to the pickup.  In June 2011, Chrysler announced a recall concerning potential outer tie rod failure (the "L16 Recall").  (Docs. 46 at ¶ 16; 38-5 at 2-4.)  The L16 Recall applied to certain Dodge Ram trucks, including the pickup TJ was driving.  (*Id.*)  Chrysler indicated the condition could result in the potential loss of directional stability in the left hand front wheel, increasing the risk of a crash.  (Doc. 38-5 at 3.)  The L16 Recall instructed dealers to inspect affected trucks by measuring the right and left tie rod angles.  (Doc. 46 at ¶ 17.)  If the angles were 5 degrees or less, Chrysler indicated the left tie rod did not need to be replaced.  (*Id.*)

On December 16, 2011, the pickup was serviced by HKT Motors, and inspected pursuant to the L16 Recall.  (Doc. 46 at ¶ 17.)  The service invoice indicated the measurements of the left and right tie rods were within the specification of the L16 Recall dealer services instructions, and did not need to be replaced.  (Doc. 38-6 at 4.)  Underberg disputes the accuracy of the measurements

taken by HKT Motors and the propriety of Chrysler's replacement specification. (Doc. 46 at ¶ 17.)

Approximately one year after the accident and disposal of the vehicle, Chrysler issued another recall on November 6, 2013 which concerned failure of the left tie rod assembly on certain Dodge Ram trucks (the "N49 Recall"). (Docs. 46 at ¶ 18; 38-7 at 2-3.)

## II. DISCUSSION

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id*. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non-moving party's case; or (2)

by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact. *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

### A.    Defendant's Motion for Partial Summary Judgment Regarding Choice of Law

The parties dispute whether Montana or North Dakota law governs the substantive issues in this case. EMC argues there is a conflict of laws between Montana and North Dakota, and that North Dakota law should control. Underberg contends there is no actual conflict between Montana and North Dakota; but even if a conflict of law analysis is required, Montana law applies.

/ / /

/ / /

1.  Whether an Actual Conflict Exists

When a court is presented with a conflict of law issue, the court must first determine whether an actual conflict exists with regard to the legal issue in the case. *Newman v. Untied Fire Cas. Co.*, 995 F.Supp.2d 1125, 1129 (D. Mont. 2014). "An actual conflict of law exists when 'application of the various states' laws could produce diverging outcomes on the same legal issue.'" *Winter v. Pioneer Drilling Servs.*, 2015 WL 9855923, *1 (D. Mont. May 14, 2015). On the other hand, if the laws of both states would produce the same result, there is no real conflict. *Newman*, 995 F.Supp.3d at 1129. If there is no actual conflict, the law of the forum state applies, and there is no need for further analysis. *Id.*

Montana has recognized the tort of third-party spoliation of evidence as an independent cause of action. *Oliver v. Stimson Lumber Co.*, 993 P.2d 11, 19 (Mont. 1999).

The North Dakota Supreme Court has not yet decided whether it will recognize an independent tort claim for spoliation of evidence. *Simpson v. Chicago Pneumatic Tool Co.*, 693 N.W.2d 612 (N.D. 2005). In *Simpson*, the Court acknowledged "that some courts have recognized the availability of a tort action to remedy spoliation of evidence," but determined "[w]e need not reach that issued in this case. *Id.* at 617. North Dakota, therefore, does not currently recognize the tort of spoliation of evidence.

EMC argues it is unlikely North Dakota will recognize third-party spoliation claims. EMC cites *Schueller v. Remington Arms Co., LLC*, 2012 WL 2370109 (D. N.D. June 6, 2012) in support of its assertion. In *Schueller*, the federal district court predicted the North Dakota Supreme Court would follow the majority of courts "in ruling that no independent tort cause of action should be available for first-party spoliation." *Id.* at *2. *Schueller*, however, did not address whether North Dakota is likely to recognize a cause of action for third-party spoliation. The *Schueller* Court noted that some courts, that do not recognize first-party spoliation claims, do allow third-party claims. *Id.* at 2 n.4. But the Court declined to address the viability of third-party spoliation claims in North Dakota, stating "[b]ecause the situation of non-party spoliation is not presented in this case, this court makes no prediction as to how the North Dakota Supreme Court would treat third-party spoliation of evidence." *Id.* at *2 n.5. Therefore, *Schueller* does not address the specific issue before this Court.

Nevertheless, because third-party spoliation it is not currently a recognized cause of action in North Dakota, Underberg's claim may be subject to dismissal under North Dakota law. Whereas, Underberg's claim is allowed under Montana law. Therefore, since application of the law of the two states could produce diverging outcomes, the Court finds there is presently an actual conflict between Montana and North Dakota law.

## 2. Application of Conflict of Laws Rules

The Court applies Montana's choice of law rules to determine which substantive law should be applied to this case. *Johnson v. Wells Fargo Home Mortg. Inc.*, 635 F.3d 401, 420 n.16 (9th Cir. 2011). Montana follows the Restatement (Second) of Conflicts of Laws, and has adopted the "most significant relationship" test to resolve choice of law issues. *Phillips v. Gen. Motors Corp.*, 995 P.2d 1002, 1007 (Mont. 2000). Under the "most significant relationship" test, the Court first determines whether the forum state has a statutory directive regarding choice of law. *Id.* at 1008. Montana has no such statutory directive. *Id.* Therefore, the Court must consider the factors set forth in § 6 and § 145 of the Restatement (Second) of Conflicts of Law to determine which state has the more significant relationship with respect to the legal issues in conflict. *Id.*

The factors under § 6 of the Restatement focus on the interests and public policies of the competing states, and consist of the following:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability, and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws, § 6(2)(a)-(g).

/ / /

Section 145 of the Restatement provides that the following contacts should be taken into account in applying the principles of § 6 to determine which law to apply:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflicts of Law, § 145(2)(a)-(d). The Montana Supreme Court states these contacts "are to be evaluated according to their relative importance with respect to the particular issue." *Phillips*, 995 P.2d at 1008.

### 3. Application of the § 6 Factors

#### a. *Needs of the Interstate and International Systems*

The first § 6 factor concerns the interest to further "harmonious relations between states and to facilitate commercial intercourse between them." *Phillips*, 995 P.2d at 1008-09. Here, both North Dakota and Montana follow the "most significant relationship" test for resolving conflict of law issues in tort cases. *See Id.* at 1007; *Nodak Mut. Ins. Co. v. Wamsley*, 687 N.W.2d 226, 231 (N.D. 2004). Therefore, this factor does not point towards applying either state's substantive law. *Winter*, 2015 WL 9855923 at *2 (finding this factor was neutral when both states followed the Restatement's "most significant relationship" test). *See also Phillips*, 995 P.2d at 1009 (stating "this factor does not point toward the

14

importance of any particular state's law.  Rather, this factor supports the application of the Restatement approach. . . .").

          b.     *The Relevant Policies of the Interested States*

The second and third §6 factors require the Court to consider the relevant policies of the forum state and other interested states.  *Phillips*, 995 P.2d at 1009.  In assessing the policies of the interested states, the Court notes that because the North Dakota Supreme Court has not weighed in on whether it would recognize the tort of third-party spoliation, North Dakota does not have any stated policy reasons to consider.

EMC argues it is likely the North Dakota Supreme Court will follow the majority of courts and decline to recognize the tort of third-party spoliation.  Thus, EMC urges the Court to consider the policy reasons behind the majority view as the policy of North Dakota.  The Court declines to speculate what North Dakota's policy reasons would be, assuming North Dakota would reject spoliation at all.

The Montana Supreme Court recognized the tort of third-party spoliation of evidence in order to deter potential spoliators, provide punishment against actual spoliators, and fairly compensate victims of spoliation.  *Oliver*, 993 P.2d at 18.  The Court emphasized the intentional or negligent destruction of evidence "threatens the very integrity of our judicial system."  *Id.* at 17.  The Court stated trial and appellate courts have a responsibility to ensure that parties to litigation

have a fair opportunity to present their claims or defenses. *Id.* The Court recognized that trial courts are equipped to carry out this responsibility with regard to parties to an action. *Id.* However, the Montana Supreme Court found that when evidence is in the possession of a third party, the various safeguards and sanctions available to trial judges are inapplicable. *Id.* Thus, the Court held it was "necessary to recognize the tort of spoliation of evidence . . . as an independent cause of action with respect to third parties who destroy evidence." *Id.* at 18. Therefore, the stated purpose of Montana's spoliation cause of action is to promote truth, fairness, and justice in civil actions by deterring the destruction of material evidence. *Id.* at 17.

Without the benefit of clear guidance from the North Dakota Supreme Court, the Court finds Montana's interest in deterring evidence destruction outweighs the speculative interests of North Dakota. The purposes sought to be achieved by Montana's spoliation tort would also be furthered by its application to this set of facts. Moreover, the Court finds North Dakota at least partially shares the same fundamental interest of promoting the preservation of material evidence by recognizing that sanctions against a party "may be appropriate when evidence relevant to the lawsuit is destroyed." *Bachmeier v. Wallwork Truck Centers*, 544 N.W.2d 122, 124 (N.D. 1996). Therefore, the Court finds this factor weighs in favor of applying Montana law.

c.    *Protection of Justified Expectations*

The fourth §6 factor considers the justified expectations of the parties. *Phillips*, 995 P.2d at 1013.  The Montana Supreme Court has stated that "tort cases generally do not involve justified expectations.  Particularly in the area of negligence, when parties act without giving thought to the legal consequences of their conduct or to the law to be applied, they have no justified expectations."  *Id.* Here, Underberg asserts a claim for negligent spoliation of evidence.[2] Accordingly, this factor should be neutral.  But to the extent EMC molded its conduct in light of the fact North Dakota does not currently recognize a cause of action for third-party spoliation when it decided to dispose of the truck, this factor weighs slightly in favor of North Dakota law.

d.    *Basic Policies Underlying Particular Field of Law*

The fifth §6 factor considers the relevant contacts in regard to the basic policies underlying the particular field of law.  *Phillips*, 995P.2d at 1014.  Montana has recognized a basic policy interest in deterring the destruction of material evidence.  *Oliver*, 993 P.2d at 17-18.  Likewise, North Dakota has indicated courts

---

[2] Underberg states that "[a]t this juncture, Plaintiff's cause of action likely presents a claim of negligent spoliation."  Doc. 44 at 13.  As discussed more fully below, Underberg has not alleged facts to show EMC had actual knowledge of Underberg's potential lawsuit against Chrysler or intentionally destroyed evidence to disrupt or defeat Underberg's lawsuit.  Thus, the Court finds Underberg has not asserted a claim for intentional spoliation.

have an interest in deterring evidence destruction, albeit in a different context. In *Bachmeier*, the North Dakota Supreme Court held that in situations of spoliation of evidence, courts may grant summary judgment as a sanction against a party to a lawsuit. *Bachmeier*, 544 N.W.2d at 126. Montana has adopted the tort of intentional and negligent spoliation of evidence to further its policy. North Dakota has not yet stated whether it will recognize a similar tort. *Simpson*, 693 N.W.2d at 617. Nevertheless, at a basic level, the policies underlying Montana's tort of spoliation of evidence, and North Dakota's power to sanction a party for spoliation, are the same. Because Montana has adopted a remedy for spoliation of evidence by third parties, and North Dakota has not, the Court finds Montana law will best achieve the states' underlying policies concerning preservation of evidence. The Court finds this factor, therefore, weighs in favor of applying Montana law.

> e. *Certainty, Predictability, & Uniformity of Result and Ease in Determination and Application of Law to be Applied*

The parties agree that the sixth and seventh factors under §6 are inapplicable in this case. Accordingly, these factors are neutral.

### 4. Application of the §145 Factors

The § 145 factors include consideration of the place of injury, the place of conduct, the parties' residence, and the place where the relationship between the

parties, if any, is centered. The Court finds that collectively, these factors weigh slightly in favor of Montana law.

First, as Magistrate Judge Ostby previously found, although the actual spoliation of evidence allegedly occurred in North Dakota, the injury Underberg alleges to have suffered is felt in Montana, where Underberg brought a lawsuit against the pickup's manufacturer. (*See* Doc. 12 at 20.) The fact that the injury in a spoliation case is somewhat speculative, does not take away from the fact that the injury is felt in Montana.

Second, the conduct that led to Underberg's injuries occurred in both North Dakota and Montana. The accident occurred in North Dakota, the pickup was taken to a storage yard in North Dakota, EMC adjusted the claims from North Dakota, and the pickup was disposed of in North Dakota. On the other hand, other substantial conduct that caused Underberg's injuries occurred in Montana. EMC issued a policy of insurance to Cross Petroleum Services, a Montana company, for the subject pickup truck in Montana. Following the collision, EMC communicated with Cross Petroleum in Montana regarding the pickup, and communicated with Donna Underberg in Montana to discuss the claim process.

As for the parties' residence, Underberg is a resident of Montana, as was TJ. EMC is an Iowa insurance company, licensed to conduct business in Montana. None of the parties reside in North Dakota.

Finally, as to the place where the relationship between the parties is centered, EMC did not have a direct relationship with Underberg or TJ.

     5.    <u>Conclusion</u>

On balance, the Court finds that the §6 and §14 factors weigh in favor of the application of Montana law to this case. Accordingly, the Court **DENIES** EMC's Motion for Partial Summary Judgment Regarding Choice of Law.

**B.    Defendant's Motion for Summary Judgment Regarding Duty and Causation**

EMC argues that under Montana law, Underberg's third-party negligent spoliation claim fails as a matter of law because (1) EMC did not have a duty to preserve the pickup, and (2) Underberg cannot prove causation between the disposal of the truck and its alleged inability to prove the claims in the underlying lawsuit. EMC further argues that any intentional spoliation of evidence claim fails because Underberg does not allege the required elements.

Underberg counters that EMC had a duty to preserve the pickup because it knew or should have known of the potential for a lawsuit resulting from the accident, and there are sufficient facts to raise a genuine issue regarding causation. Underberg concedes that it is not contemplating an intentional spoliation claim at this point.

/ / /

### 1. Intentional Spoliation of Evidence

As discussed above, the Montana Supreme Court recognized the tort of intentional spoliation in *Oliver v. Stimson Lumber Co.* In order to establish the claim, a plaintiff must prove the following elements:

(1) the existence of a potential lawsuit;
(2) the defendant's knowledge of the potential lawsuit;
(3) the intentional destruction of evidence designed to disrupt or defeat the potential lawsuit;
(4) disruption of the potential lawsuit;
(5) a causal relationship between the act of spoliation and the inability to prove the lawsuit; and
(6) damages

*Oliver*, 993 P.2d at 22.

Here, Underberg has not alleged, or cited any evidence that EMC intentionally destroyed the pickup to disrupt or defeat the underlying litigation. Accordingly, Underberg's claim of intentional spoliation of evidence fails as a matter of law, and summary judgment is appropriate.

### 2. Negligent Spoliation of Evidence

The *Oliver* Court also recognized negligent spoliation of evidence as an independent cause of action under Montana law, which consists of the following elements:

(1) existence of a potential civil action;
(2) a legal or contractual duty to preserve evidence relevant to that action;
(3) destruction of that evidence
(4) significant impairment of the ability to prove the potential civil action;
(5) a causal connection between the destruction of the evidence and the

inability to prove the lawsuit;

(6)    a significant possibility of success of the potential civil action if the evidence were available; and

(7)    damages

*Oliver*, 993 P.2d at 19.

As reflected by the second element, a plaintiff asserting a claim for negligent spoliation must establish the defendant owed a duty to the plaintiff.  Whether there is a legal duty is a question of law for the court's determination on summary judgment.  *Jackson v. State of Mont.*, 956 P.2d 35, 42 (Mont. 1998).

There is no general duty to preserve evidence for the use of others.  *See Oliver*, 993 P.2d at 19-20.  In determining when a party is required to do so, the Montana Supreme Court in *Oliver* noted it was sensitive to the legitimate interests and rights of third parties to control and dispose of their property as they see fit. *Id.* at 18, 20.  Therefore, in adopting the tort of spoliation, the Court attempted to craft a "balanced remedy." *Id.* at 18.  In doing so, the Court adopted the specific requirements for the imposition of a duty to preserve evidence set forth in *Johnson v. United Servs. Auto. Ass'n,* 67 Cal.App.4th 626 (Cal. Ct. App. 1998).  In *Johnson,* the California Court of Appeals emphasized that the tort of negligent spoliation by a third party only warranted the imposition of a "limited duty" to preserve evidence, which could only be created in four specific situations. *Id.* at 635.  In *Oliver*, the Montana Supreme Court adopted *Johnson's* duty requirements almost verbatim, and held a legal duty to preserve evidence may arise in only four

22

circumstances, where:

> (1) the spoliator voluntarily undertakes to preserve the evidence and a person reasonably relies on it to his detriment.
>
> (2) the spoliator entered into an agreement to preserve the evidence;
>
> (3) there has been a specific request to the spoliator to preserve the evidence; or
>
> (4) there is a duty to do so based upon a contract, statute, regulation or some other special circumstance/relationship.

*Oliver*, 993 P.2d at 20.

Here, the Court finds Underberg has not alleged any facts that would support a finding of duty under the *Oliver* factors. Underberg does not allege, and there is simply no evidence to suggest, that EMC voluntary undertook to preserve the pickup or entered into an agreement to preserve the pickup. Further, Underberg admits that it never made a specific request of EMC to preserve the pickup. (Doc. 46 at ¶¶ 10-11.) Indeed, EMC was not contacted regarding the pickup until over a year after the accident. (*Id.* at ¶¶ 11, 15; Doc. 38-1 at 44-45.) There is also no allegation EMC had a duty to preserve the pickup on the basis of a contract, statute or regulation.

Underberg nevertheless asserts that EMC had a duty to preserve the pickup on the basis of a "special circumstance/relationship" between EMC and Underberg. Underberg asserts that EMC, as a sophisticated insurer, should have foreseen that a

potential lawsuit would be brought by Underberg, including a potential products liability suit. Underberg claims EMC knew or reasonably should have known that Dodge Ram pickup trucks had been recalled for defective left outer tie rods, and that the consequence of the defect was a loss of directional control. Thus, Underberg contends EMC had a duty to preserve the pickup for Underberg's use in a potential lawsuit against Chrysler.

But the Court in *Johnson* describes the duty to preserve evidence based on a special relationship differently. The Court held that "a duty may also be based on some other contractual foundation, or on a statute, a regulation (for example, record-retention statutes and regulations), or some other analogous special relationship. *Johnson,* 67 Cal.App.4th at 635. The special relationship Underberg urges the Court to adopt is not analogous to a relationship based on a contract, statute or regulation, as contemplated by *Johnson*. Therefore, Underberg has not established that EMC had a duty to preserve under any of the factors set forth in *Johnson* and *Oliver.*

In addition, Underberg has not produced any evidence that EMC had actual notice of a potential lawsuit against Chrysler. The evidence shows EMC received a Carfax report that indicated there were no open manufacturer recalls on the pickup. (Docs. 38-2 at ¶ 7; 38-8 at 2-6; 46 at ¶ 19.) The record suggests the Carfax report was accurate. Although the L16 Recall had been announced, the

pickup had been serviced by HKT Motors and passed the manufacturer-approved

inspection for the L16 Recall prior to the accident.  (Doc. 38-6 at 4.)  It is also

undisputed that Underberg did not notify EMC about any potential claim based on

a recall or any other defect with the pickup.  (Doc. 46 at ¶¶ 10, 15.)  Therefore,

Underberg has not produced any evidence showing that EMC had actual

knowledge of a potential claim that would have triggered a duty to preserve the

vehicle.

Even assuming "it was well known that certain Dodge Ram trucks,

specifically the left outer tie rods, were defective" (Doc. 46 at ¶ 27), and that this

general knowledge should be imputed to EMC,[3] Underberg has shown, at most,

potential constructive notice of a need to preserve evidence.  As the weight of

authority makes clear, however, constructive notice of a potential lawsuit is

insufficient to trigger a duty to preserve evidence.

Although the Montana Supreme Court has not expressly addressed the issue

of constructive notice and the tort of spoliation of evidence, several courts around

the country have.  Again, the case relied upon in *Oliver* to establish the parameters

of a duty to preserve specifically addressed the issue and held "constructive notice

of a need to preserve is not enough to create a duty to preserve."  *Johnson,* 67

---

[3] Underberg has not produced any evidence to show EMC actually understood this
purportedly "well known" fact.

25

Cal.App.4th at 629.

In *Johnson*, a passenger injured in a car accident brought a third-party negligent spoliation claim against the automobile insurer. The plaintiff asserted the insurer had a duty to preserve the car for plaintiff's use in a product liability suit against the manufacturer. *Johnson*, 67 Cal.App.4th at 630. The Court found the fact the insurer knew, or should have known, there was a seat belt malfunction, showed only constructive notice of a potential claim. The Court held that was not sufficient notice to create a duty to preserve evidence. *Id.* at 635-36. In reaching its conclusion, the Court stated it was common knowledge that thousands of car accidents occur each year, leaving behind totally and partially damaged cars and trucks. *Id.* at 637. The Court noted "[e]very accident involving personal injury or property damage has the potential to be a lawsuit." *Id.* In the face of this vast expanse of potential liability, the Court stated the duty of a third party who controls one of these totaled vehicles must be based on actual, specific knowledge. *Id.*

Other courts have likewise held that constructive notice is insufficient to create a duty to preserve evidence. *See e.g. Smith v. Atkinson*, 771 So.2d 429, 433 (Ala. 2000) ("We also agree with *Johnson* that a third party's constructive notice of a pending or potential action is not sufficient to force upon the third party the duty to preserve evidence."); *Mace v. Ford Motor Co.*, 653 S.E.2d 660, 667 (W. Va. 2007) (affirming summary judgment in favor of insurer on negligent spoliation

claim where there was no evidence the insurer "had clear and direct knowledge" the vehicle driven by plaintiff was defective, ); *Gilleski v. Cmty. Med. Ctr.*, 765 A.2d 1103, 1108 (N.J. Super. Ct. App. Div. 2001) ("We agree with the California and Alabama courts that mere constructive notice of a potential third-party action based solely on the happening of an injury is insufficient."); *Hannah v. Heeter*, 584 S.E.2d 560, 570 (W. Va. 2003) ("We emphasize that a third party must have had *actual* knowledge of the pending or potential litigation. '[A] third party's constructive notice of a pending or potential action is not sufficient to force upon the third party a duty to preserve evidence.'"); *Reid v. State Farm Mut. Auto. Ins. Co.*, 218 Cal.Rptr. 913 (Cal. Ct. App. 1985) (finding insurer had no duty to preserve a car where it was undisputed that the insurer did not have actual knowledge of a potential lawsuit by the plaintiff against the manufacturer, seller and repairer of the vehicle, until plaintiff's counsel contacted the insurer more than one and a half years after the accident). The Court finds these cases persuasive, and therefore, holds EMC's purported constructive notice of a potential lawsuit by Underberg was insufficient to impose a duty on EMC to preserve the pickup.[4]

---

[4] Underberg cites *Coleman Const. Inc. v. Diamond State Ins. Co.*, 2008 WL 2357376 (D. Mont. June 5, 2008). *Coleman*, however, is distinguishable because it arose in the context of a third party claim against an insured. In *Coleman*, the Court held that when an insurer has notice that its insured may have liability exposure to a third party claimant, the insurer will have a duty to preserve evidence relevant to that claim. *Id.* at *5.

In attempting to impose a duty to preserve in this case, Underberg essentially argues that EMC was too quick to dispose of the pickup.  But regardless of whether EMC acted too hastily, Underberg was also not diligent.  Underberg waited for well over a year to let EMC know it had any interest in the pickup at all.  The practical result of Underberg's theory of liability would have required EMC to hold onto the pickup indefinitely, or at least until the statute of limitations expired on Underberg's potential claim against Chrysler.  The Court is not aware of any authority which would support such a theory, and require an insurer to store a salvage vehicle until the statute of limitations runs out on any imaginable claim that might be brought by a third party.  In the absence of a recognized duty, the law simply does not require such an onerous burden on insurers or other property owners, and the Court declines to impose one here.

Because Underberg has not established EMC owed a duty to preserve the pickup under the facts of this case, EMC is entitled to summary judgment.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## III.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.      EMC's Motion for Partial Summary Judgment Regarding Choice of Law (Doc. 36) is **DENIED**;

2.      EMC's Motion for Summary Judgment Regarding Duty and Causation (Doc. 39) is **GRANTED**.

**IT IS SO ORDERED.**

DATED this 20th day of March, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge